22-825 Good morning. May it please the court, Kevin Meehan of Curtis Malay for the Appellant State of Libya. And I believe I've reserved two minutes for rebuttal. The central question in this case is whether or not the parties had entered into and there existed an arbitration agreement. This issue is squarely an issue of contract formation. Basic principles, offer and acceptance. Now, the language here comes out of a treaty, a bilateral investment treaty between Cyprus and Libya, which the parties have referred to as a BIT. The BIT contains a dispute resolution clause that contains an offer. And that offer gives investors a choice to submit their disputes for resolution between one of four different fora. And that menu of fora is laid out in the disjunctive, A or B or C or D. And it elected initially the investor here to proceed in a Libyan domestic court. That's correct, Your Honor. And we say that they have made, having made that choice. But even assuming that this was a either or choice and that the district court was not completely correct in how it handled it, didn't the terms of agreement specify clearly that the arbitrators had the full say on this? Now, I know that you didn't agree with the terms of agreement and consistently said you weren't part of it. On the other hand, you did go along and you could have said, these are the terms of agreement. We have to sign them, but we don't agree with them and then not take part in the arbitration. Your Honor, I believe you're referring to the terms of reference. Yeah, terms of reference. So once Olin initiated the ICC arbitration, that kicked in a whole set of procedural steps that Libya, if they wanted to not default in the arbitration and wanted to participate, would raise their objection. But you could have done that and then defaulted and then said that the arbitration was invalid because you hadn't agreed to it. Well, Your Honor, there's a long line of case law that holds that a party doesn't have to force it. Yeah, that long line of case law says one thing about whether you then sign it and then don't take part or whether you then take part as you did in this, in the next one. Well, this is essentially the first options case where you had a party who objected to the arbitral jurisdiction. They participated in the proceedings, and then there was an adverse reward on jurisdiction. And the Supreme Court still said that that is something that is reviewed de novo. And they affirmed the vacature of the judgment that had been entered on the award. But to follow up on the tour, the terms. The specific language that your client agreed to included that the arbitration panel, the ICC, would also resolve the issue of whether this was an arbitrable dispute. So it wasn't just that you participated, it's that the actual terms of the agreement encompassed leaving it to the ICC to decide whether or not it was appropriate for the ICC to make that determination. So you could have negotiated different terms, but you didn't. Well, I believe what happened here is that in the terms of reference, it requires the parties in any ICC arbitration to front the issues that are going to be presented to the arbitral tribunal. And here, in order to preserve the argument that there was no arbitration agreement, they were required to put that issue into the terms of reference. Because if you don't put it in, then you've waived the issue both before the arbitral tribunal and frankly before the court. Well, I understand the challenge, but the agreement went on to say, and you, ICC, have the right to make the final determination of whether this is a matter that can be arbitrated or not. And so that's the part, the terms, that I'm kind of focusing on. Why would your client need to do that not to have a waiver? My understanding is what happened was the terms of reference, Libya presented its objection to jurisdiction, and that the terms of reference, as is required in any terms of reference in an ICC arbitration, provided for ICC rules to apply. Can you go back a little bit? Yes, Your Honor. So that I fully understand what happened. So after this Libyan, the Libyan court decision, what happened? So the Libyan courts, there was protracted litigation for over a decade. Olin got some of the relief that it wanted, but not all of it. So then they decided to bring an arbitration before the ICC. No, no, there were two, and I think the presiding judge wants you to focus on the two cases that were brought. The first one as to the taking, the second somewhat more broadly. And one of the questions before us is whether these two are really inconsistent with arbitration. The first one seems to me not inconsistent at all. It dealt with a different issue, a taking or not. The second one is more of a problem, because it dealt with maltreatment in general. But we have a so-called free part, whatever it's called, test. And I'd like you to address that side as to whether we are really, whether, assuming that it was either or, that the other party took the or as to both. Sure, and as I understand it, there were two different cases in the Libyan courts. One to seek annulment of the expropriation decree, and then the other was seeking compensation. And I think in the first instance, the annulment of the expropriation decree, there is an overlap here because the arbitral tribunal itself looked at what the Libyan courts did and said, well, they applied the same standards that apply here under the BIT, so we're essentially going to give that collateral effect. And we're going to say that that is conclusive evidence that Libya is liable under the BIT. With respect to damages, okay, yes. No, with respect to liability under the BIT, with respect to expropriation. With respect to compensation, in the second Libyan court proceeding, the court had found that they had not met their burden of proving their damages. And so basically what they did, Olin treated that as a trial run, and then got a second bite at the apple. And they made a very large claim for damages, which they didn't get anything near what they had claimed in the arbitration. But they at least got a second go around to try to get damages. And the way that the dispute resolution clause has been read to permit successive litigation and arbitration, I mean, there's really nothing to stop them now to go to another reform. They can go to Sweden now. So let me go back to my question, which was sort of along the lines of what Judge Galbraith was saying. At a certain point, and this is also maybe what Judge Kahn was suggesting. At a certain point, did the state of Libya not have an opportunity to play this card, that is, we are not going to participate in this arbitration. Because it's already had a bite at the apple pursuant to the bit that lays out the, it's almost like an election of remedies argument, right? Or election of four arguments. Well, yes, it provides for a choice of one of the four fora. And the argument that was made in the arbitration is that they had already made that choice, and therefore there's no- But was there an opportunity before, in connection with pursuing an arbitration, with Olin's pursuit of an arbitration, to say to some other court somewhere, some other forum, it can't do that because it's already elected its rep. Well, that was the argument that was made in this arbitration. And the case law I submit is clear that merely participant- Where the argument was made. Was there an opportunity to make the argument somewhere else, or in some other forum, or in some other way? Well, I don't think they, you know, Libya was required to initiate some sort of proceeding to do that. I'm not saying that it was required to do anything. I'm just asking a question. It is not a trick question. Just educate- I don't believe so. I don't think it would have been clear to have raised this issue until the request for an ICC arbitration was made by Olin. But what is so unfair about somebody saying we believe this arbitration is invalid and therefore we do not take part in it and we are defaulted and we claim it wasn't there because it's manifestly clear that the other side rejected arbitration earlier? Is that so unfair that we cannot ask the Supreme Court, you know, in first options and then the Ninth Circuit actually more clearly on your side have suggested that that's unfair? But I'm not altogether- I don't know. I think it would be unfair. First, it would be contrary to the general policy that we try to foster participation in arbitrations. And beyond that, you have to recall that this was an excessive demand that was made in the ICC arbitration of, I believe, 157 million euros. And you shouldn't be required to just allow for an award of that magnitude to be entered against you before you then hope that a court will entertain an argument that there was no jurisdiction despite the fact that you had willfully refused to participate in the underlying proceeding and raise that issue in the first instance. There's certainly a concern that having not participated, not argued- How much is the question of whether it was either or or a gateway, something that is in the district court's discretion as a question of fact? Well, we would say that this is an issue that is to be reviewed de novo by the district court because it goes centrally to the issue of the formation of an arbitration. Contract formation. Exactly. I don't understand that. Because, and maybe I've misunderstood your entire argument, which is entirely possible, but the contract formation is the bid, correct? The bid is the offer. Okay. Okay, and so the offer is- And the investor, but the investor. After having had its property allegedly expropriated, was entitled, under the bid, to pursue one of those remedies, one of those choices. And they did. They made that choice. The choice was to go to the Libyan court. Why is that an acceptance of an offer, generally speaking, that we are going to trigger whatever remedies are available to us under the bid? Why is that not the acceptance of the offer? They did accept the offer because they chose one of those four, which was the Libyan courts. And once they made that choice, there was no other offer outstanding. So when you say offer, that's an extremely narrow offer. It's just not an offer to arbitrate and then we'll figure it out. It's an offer after the agreement to arbitrate under the bid. Well, there is no agreement to arbitrate in the bid. There is a dispute resolution clause that contains an offer to submit disputes to 1044. One of those four is the courts in Libya or Cyprus, depending on the situs of the investor. Then you have arbitration under the ICC. You have exit arbitration. You have arbitration in Stockholm. And at each- Or, or, or. And it's the first offer accepted here, in your view, which is the Libyan domestic court litigation. And then they, there was no other offer after that. That's the way that you ask us to view it. Once you've accepted the offer to litigate in the Libyan courts, there's no more offer outstanding. And this is the purpose of this term in the bid is to resolve disputes. And you really can't resolve a dispute by keep going to different places. Could Libya, any member, could it have permitted Olin to elect another remedy after having elected the first remedy? In other words, did Libya have the discretion to provide another offer? Because what you're, look, I'm a securities person. So you're providing a cascade, but you're saying offer ends at the first tier. Does Libya have the discretion under the bid to say, in its discretion, we're going to allow, we're going to give an offer to the second tier? That is, in this case, arbitration. Well, that's certainly not what happened in this case. I understand. But I, party freedom of contract. You can agree to enter into different contracts at different times. So I don't know if there was anything in the bid. Although I would say it's not something that would be logical. Because why would they, why would Libya or Cyprus decide that the decisions of their courts, they've already given them, you know, over a decade's worth of litigation. They got some but not all of the remedies that they wanted to do a do-over. To spend the money and the time and the expense to go through a whole other litigation of the exact same issues. We've got your, I think your argument well in mind. We'll hear from your friend on the other side. Thank you very much. Mr. Berger. Good morning, your honors. May it please the court. James Berger of DLA Piper. Here on behalf of the petitioner appellee, Owen Holdings Limited. Your honors, I want to speak directly to the issue that you were discussing with my colleague. And that has to do with whether or not this case is truly about contract formation. Because we don't think that it is. Libya has asked the court to accept that this is a case about contract formation without actually showing any reason why it necessarily should be that. This court in the doctor's associates case was confronted with a similar question. And it's an important question. If the case is about contract formation, doctor's associates suggests that the court and only the court can make the determination about whether or not an arbitration agreement was reached. If the case is about the validity of that agreement, or about some other facet of the enforceability of an agreement, then that issue can be delegated to the arbitrators to make that decision. That we understand. Okay. So what we get to then is who has the burden of demonstrating that it actually is a case about contract formation. You can't simply say it's a case about contract formation just because you want it to be that. Doctor's associates shows that- You look to the language. You look to the language. And the language of the contract itself does not give arbitrators unusual power. And it does look like an either or. If you look to the terms of reference, it gives that power. So we're kind of stuck in a situation where something looks one way and something looks the other way. And no, Libya did not do much. And one is tempted to find that this should go into arbitration. But in terms of our cases and so on, I'm not sure that's very easy. Well, Judge Calabresi, I appreciate that observation and the question. I would say this. There is actually quite a bit of case law from this circuit and from other circuits, frankly, that says that when parties agree to arbitrate under rules that provide for the arbitrators to determine their own jurisdiction, that that constitutes clear and clearly manifested agreement. Do those cases apply when somebody consistently refuses, says, but I don't agree? Now, you know, the cases are funny because in cases where we've done that and then pulled out, we've said, okay, that's enough. In this case, they said that, but then went along so that they went further than some of our cases. But where does it fit in this line of cases? And is it fair to say to somebody, if you don't sign, you're going to be liable in arbitration for $150,000 million and so on and whatever? If I can take your question this way, Judge Calabresi, I would say that the offer that was put out there, and we just talked about offering an acceptance, and my colleague framed the issue in those terms, okay? And I will acknowledge that that's what we're looking at. We're talking about whether or not there was an agreement to arbitrate and what was actually agreed to be arbitrated. So you've got a treaty that puts an offer out there that says you, the investor, have the choice to choose one of these, okay? You can choose. These are your options for dispute resolution. And let's say we've got a cascading, okay. If I could just put that aside for one moment so that we can frame what's being offered and what's being accepted. So the offer to arbitrate under ICC rules, I think under this court's well-established precedence, says if that offer is accepted, then you've agreed to arbitrate under the ICC rules. And the ICC rules then delegate the issue of determining arbitrability to the arbitrators. So if we look at it at that level, at that level of the agreement that's being made, I think it's clear under this court's case law that- There's a problem. The problem is that that's not what happened. What he is saying is that there was an offer made to litigate in the Libyan court. That was concluded. And then there was no subsequent offer. And just to pick up on Judge Calabresi's question, they said we have no choice. And maybe the answer is that they did have a choice at some point, not to participate in the arbitration and so on. But I think that what Mr. Mia was saying was that in that first offer, okay. If we had lost everything, then we would have been stuck with that. But there was no subsequent offer that was then accepted. Here's how that plays out, Judge Lawyer. That's true if one party, the court or the arbitrator gets to decide whether or not that's right. Okay, that's the question that we're here to talk about today, is whether or not it was a multiple forum clause that allows the use of one of more of those dispute resolution techniques or whether it was, as Libby would have the court think, an exclusive offer that is rescinded as soon as one of the options is taken. Okay, either the district court got to decide that on a de novo review or the arbitrators got to decide that because that was delegated to them. And so we have to then look at this question as, is it a question about contract formation? What is the contract? Really, my question is, when you talk about contract, you talk about the entire contract. When he talks about contract, it seems like it's almost seriatim contracts. We're talking about the same thing, Your Honor. I think that we both would agree, I would think that my colleague and I would agree that the contract here is formed by the offer that's contained in the treaty and the acceptance of that offer by the service of a request for arbitration. That's what happened here. The only question is whether or not the offer still existed, whether that offer was still extant by virtue of the fact that my client filed a similar lawsuit in the Libyan courts before accepting the offer. I think that's what this whole case is all about. So the question then becomes, who gets to decide whether or not that offer was still extant? The arbitrators were asked to answer that question, and they answered it. They said, yes, the offer was still existing, and it was accepted. But where do you get the authority for the arbitrators to make that decision rather than a court? In the terms of reference or in the agreement to arbitrate? Where do you get the fact that it's the arbitrators who make that decision? You would get it, Judge Calabresi, in this case from this court's decision in Shaw v. Triple Fine, which says that the ICC rules, that when parties agree to arbitrate under the ICC rules, that they are agreeing to allow the arbitrators to determine their own jurisdiction. Is that so when they consistently say, we're agreeing because we can do no other, but we don't actually agree? Is that still the case? That's the offer that they made in the treaty, was to arbitrate under the ICC rules. So I would focus the court more on the rules, more on this court's decision in Shaw v. Triple Fine, than I would on the terms of reference. Because this court's precedents make very clear that when a party agrees to arbitrate under rules that allow, that actually in this case direct the arbitrators to determine their own jurisdiction, that's the answer to the question. They get to make that decision. The only thing, if I could, I'm sorry, I was going to say the only thing that would change the outcome here is if in fact this is a question of contract formation, because this court's decision, doctor associates said, you can't delegate that authority to arbitrators. But in order to demonstrate that it is a question of contract formation, they have to show that just the way the court and doctor's associates did. It's not a matter of labeling. It's not an idle question. It either is something that goes to the formation of a contract, or it goes to the validity of that contract. Because the contract here, as we've talked about this morning, as a matter of fact, there was a qualifying investor, there was a treaty with an invitation to arbitrate, and there was acceptance of that offer. So the question for the court today- Acceptance of that offer as soon as the arbitration started? When was the precise moment of acceptance? When the request for arbitration was served on Libya, that's when the contract is accepted. I'm sorry, Judge Kahn. No, no, that's quite all right. You rely on the Chevron case, and in that case, the same argument of waiver and estoppel was made. And the court didn't decide the case on the waiver in Chevron. So you seem to not be agreeing then with the district court's position in this case, treating it as sort of a procedural precondition or a gateway. And going to the second argument of just giving deference to the ICC's decision on what can be arbitrated or not, whether the dispute can be arbitrated, are you abandoning any claim of waiver? And if you're not, how do we address the fact that even the Chevron court chose not to go there and basically went on the second argument? Judge Kahn, we are not abandoning any suggestion that what happened here was a waiver. And I think if you look at the facts in this record, it was a waiver. It's a waiver argument. And if it is a waiver argument, which we're talking about conduct-based waiver, the argument going, you brought a lawsuit instead of bringing arbitration, so you waive the right to arbitration. This court hears cases like that all the time. That's very common in arbitration jurisprudence for parties to say, hey, look, you can't do both. Here, in a treaty which provides a different sort of dispute resolution mechanism than you might find in the Federal Arbitration Act, it's a little bit more complicated. But yes, we would say that this is, in fact, a waiver or a preclusion issue or something like that. It's not a contract formation issue. And I think the law in this circuit is crystal clear that if it is a waiver issue, this is not just a law in this circuit. This is Supreme Court case law. It says that if it's a waiver, if it's a procedural gateway issue, it's appropriately resolved by the arbitrators. And that's what happened in this case. And if, hypothetically, we were to disagree with you that this was a waiver issue, would you then, your argument then falls to the terms of reference and that the parties clearly and unmistakably agreed to delegate the questions to the tribunal, to the ICC? It would not fall to the terms of reference, Judge Kahn, what I would say principally. And I know that the district court looked at the terms of reference. And you can look at the terms of reference and say, yes, this is an agreement by Libya to arbitrate under the ICC rules. But I don't think you have to get that far down the timeline. Your argument is that the agreement to arbitrate, having that one of those things under the ICC rules are later going to be. So you're already bound before you've come in and said we cannot, we won't go along. That's right. It's not you're ignoring the terms of reference, but you're saying they've already agreed to them before they agreed to them when they agreed to the ICC rules. That is a better way of putting it than I put it, Judge Calabresi. And I appreciate that. That's exactly what the argument is. By the time the terms of reference got negotiated and signed, it was already an ICC case. The offer was out there as we talked about offer and acceptance. The offer in the treaty is arbitrate under ICC rules. If the investor elects to proceed under that route, then that's where you go. And the ICC rules then become the rules that will govern the resolution of that dispute. So once more, the only question. Isn't that statement that the ICC rules are there and they've agreed to them already a determination that this is not an either or or a gateway, but is a gateway. Because if you say they're bound by those, then it must be that the fact that they went into court was not enough to rule that out. So that you're back to doing what the district court did of saying it is a gateway. Yes, I would agree with that. And I see my time has expired. But I think there's one more point that's apropos of your question, Judge Calabresi, which is that it's important to bear in mind. And you can see this in the record. The case that was brought before the ICC was not precisely the same case that was brought in the Libyan courts. And part of the case that was brought to the arbitration tribunal. That was my question before. I think the first case was clearly different. The second case is more of a problem. Because it looks more like what they're asking for in arbitration. But I would only point out that the arbitration was brought partially to complain about what happened in the litigation. That's a denial of justice, as frequently happens in international dispute resolution scenarios. I see my time has expired. I'm happy to- So may I ask another question? Is there anything- if things had not gone so well in the arbitration, there are two other possible avenues. And your view, I think, is that your client would have been able to pursue those avenues. I don't think, Judge Laudio, that my client would take that position. That they could simply- Well, I'm asking you. No, I don't think they would be able to do that. Why not? Well, there are notions of preclusion and res judicata and collateral estoppel and things that arise even in the international dispute resolution system. So what happened here was the client made a decision to go to litigation first. Those litigations proceeded as they did. And then following the litigation, as I just mentioned, they were unhappy with the way they were treated by the Libyan courts. And as happens, not infrequently in the ISDS system, International Dispute Resolution System, they went to arbitration partially to complain about the way they had been treated in the local courts. So the suggestion that they could then keep going back to different venues to try to find better results, I think it's something that my colleagues could say is the result of all this. But there are self-regulating mechanisms in this system. And res judicata is one of them. It does apply. But your view that you want us to embrace, in part at least, is that this was sufficiently different in part because the arbitration was an attack, a challenge to the process in a Libyan court. I think that's an important fact to bear in mind because they were not the same case. And if they're not the same case, then their argument sort of loses its factual legs. But what I really would like for the court to say is that because there was an offer to arbitrate under the ICC rules, that the arbitrator was entitled to make the determination about its own jurisdiction and that Judge Kotel was not required to do an over-review of that determination. We think that's the law in this circuit. We think that's the right outcome here. Thank you very much. Thank you, Your Honor. Mr. Meehan. And I just want to repeat a few things that my colleagues said that I think are enlightening. One is the admission that under the doctor's associate case is that the issue of contract formation is always an issue for the courts and one that can't be delegated to the arbitrators. And that's squarely the issue that we have here. And I'd like to use an analogy. Imagine you receive a wedding invitation. The wedding invitation gives you a choice of chicken or fish. And you mark down on the card and return it chicken. And then you get to the wedding and you have the chicken. And now you say, oh, I want the fish. Was there an agreement to have fish? I don't think so. And that's exactly what happened here. But in your analogy, if the chicken is spoiled and you don't want to have chicken, because apparently they purchased a batch of chicken that has salmonella, should you be forced to eat the chicken? Or can you at a wedding ask for the other menu option? Well, there wasn't any spoiled chicken here in the Libyan courts. Well, isn't that the issue? That your opponents are, in essence, claiming why they went to arbitration? Perhaps. They brought a denial of justice claim in addition to another litany of repeat claims. And the denial of justice claim was denied and rejected. And not only did the arbitrators reject the notion of denial of justice, they, in fact, looked at what the Libyan courts did, as I said before, and said the Libyan courts applied the standards in the bit. And the arbitrators found that that was conclusive evidence of liability under the bit and precluded them from arguing on the merits of this. Another piece that I'd like to point out here, too, is I've heard the word cascade used a couple of times. And that's my word, not your friend's word. Fair enough. I just want to make clear that the way that this provision worked is it gave a choice of one of four fora. So they could have chosen, in the first instance, to bring an ICC arbitration. They could have chosen to bring it in Stockholm. But the question here is, let's imagine they had brought an arbitration under the Stockholm Chamber of Commerce. Their reading of this provision, they say, and what the tribunal accepted, was that having brought it in Stockholm, well, now you can bring it to the ICC because you weren't happy with what you got. So that is sort of the issue here. They weren't happy because they didn't get all of the relief that they saw. They got some, but not all. And so they decided to bring a repeat litigation before the ICC. And then there's another point that I'd also like to raise about the reference to the ICC in the bit. And they argue that that's an agreement. Well, it's only an agreement to arbitrate under ICC rules if you find that there was an agreement formed. Again, it comes back to our argument that because they had a choice of accepting A, B, C, or D, and they chose A, which was the Libyan courts, there was no longer any offer to accept and thus no agreement to arbitrate under ICC rules or any rules. Thank you. Thank you very much. Thank you very much. All reserve the decision.